## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| **ADAPTIVE AVENUE ASSOCIATES, INC.,** | C.A. No. 4:25-cv-01138-SDJ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | **PATENT CASE** |
| **FABLETICS, INC.,** | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Adaptive Avenue Associates, Inc., files this Complaint for Patent Infringement against Fabletics, Inc. and would respectfully show the Court as follows:

### I.  THE PARTIES

1.      Plaintiff Adaptive Avenue Associates, Inc. ("Adaptive Avenue" or "Plaintiff") is a Minnesota corporation, having a principal place of business located at 445 Minnesota St. #1500, St. Paul, MN 55101.

2.      On information and belief, Defendant Fabletics, Inc.  ("Defendant") is a corporation organized and existing under the laws of Delaware with a place of business at 7400 Windrose Ave, Ste #B120, Plano, Texas 75024. Defendant has a registered agent at Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### II.  JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4.      On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein. Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains a place of business at 7400 Windrose Ave, Ste #B120, Plano, Texas 75024.

5.      Without limitation, on information and belief, within this state, Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein.  In addition, on information and belief, Defendant has derived revenues from its infringing acts occurring within Texas.  Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from services provided to persons or entities in Texas.  Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its providing services within Texas.  Defendant has committed such purposeful acts and/or transactions in Texas such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

6.      Venue is proper in this district under 28 U.S.C. § 1400(b). On information and belief, Defendant maintains a place of business at 7400 Windrose Ave, Ste #B120, Plano, Texas 75024.  On information and belief, from and within this District Defendant has committed at least a portion of the infringements at issue in this case.

7.       For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

### III.   UNITED STATES PATENT NO. 7,171,629

8.      Plaintiff incorporates the above paragraphs herein by reference.

9.      On January 30, 2007, United States Patent No. 7,171,629 ("the '629 Patent") was duly and legally issued by the United States Patent and Trademark Office. The '629 Patent is titled "Customizable Web Site Access System And Method Therefore." The term of the '629 patent has been adjusted by 252 days. A true and correct copy of the '629 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10.     Adaptive Avenue is the assignee of all right, title, and interest in the '629 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '629 Patent. Accordingly, Adaptive Avenue possesses the exclusive right and standing to prosecute the present action for infringement of the '629 Patent by Defendant.

11.     The invention in the '629 Patent relates to systems and methods to enable multiple types of automated navigation through a plurality of website addresses. (Ex. 1 at col. 7:30-35). The inventor recognized inefficiencies of the prior art's ability to deliver automated presentations without needing to reprogram the entire web site and enable targeted content for the specific user. (*Id*. at col. 7:60-67).

12.     Mr. Quimby is the sole inventor on the '629 patent. (Ex. 1 at cover; Ex. 2 at ¶2). Mr. Quimby is also the founder, owner, and CEO of Adaptive Avenue. (Ex. 2 at ¶3). A declaration of David Quimby in support of this Complaint is attached hereto as Exhibit 2 and is incorporated herein by reference.

## Background of the Inventions

13.     Prior to conceiving the inventions disclosed in the '629 Patent, Mr. Quimby received a Bachelor of Arts degree in Economics with emphasis in mathematical economics and developmental economics from the University of California, Los Angeles in 1980 and received a Master of Business Administration with emphasis in organizational behavior and sociotechnical

systems from the University of California, Berkeley in 1987. (Ex. 2 at ¶4).  Mr. Quimby's career included working as a senior consultant in the advisory services group at Deloitte & Touche, working as a senior technology analyst at Stanford Research Institute, and working at Bank of America as a technology planner and technology executive in the world banking division, eventually earning the corporate title of vice president.  (Ex. 2 at ¶¶5-7).

14.    During the early stages of his career, he "gained a passionate interest in the intersection between technology / human behavior and technology / social systems," (*id*. at ¶5), and "assisted in the conception and launch of inter-disciplinary, multiclient initiatives in distributed computing, hyper-distributed computing, and social computing," gaining a keen appreciation for user-centric design, *id*. at ¶6.  He also led the adoption of client-server architecture on several projects and worked at the forefront of client-server architecture for several years.  (*Id*. at ¶ 7-8).

15.    In the mid to late 1990s, Mr. Quimby's interests turned to the emerging phenomenon of the World Wide Web and he began the entrepreneurial pursuit of problems with the usability and navigation of the World Wide Web.  (*Id*. at ¶ 8).  He realized that the conventional way of viewing information on the World Wide Web was limited.  (*Id*.).  He "recognized the need for a system that enables Web developers to provide an automated presentation of information in organized sequences without the cost of reprogramming site content." (*Id*.).  He also "recognized the need for Web users to view presentations created by Web developers or create their own presentations of Web content without installing development tools." (*Id*.).

16.    In 1998, Mr. Quimby founded Virtual Coast Associates, Inc., as a platform for incubating various Web-related opportunities, (*id.* at ¶9), and in 2000, he founded Adaptive

Avenue to commercialize the technology that forms the basis of the invention disclosed in the '629 Patent, (*id*. at ¶10).

17.     Prior to Mr. Quimby's inventions disclosed in the '629 Patent, "the existing technology for viewing content on the World Wide Web was either monolithic (not granular and customized to the user's particular situation) or tedious and labor-intensive." (*Id*. at ¶ 13). "Likewise, although the existing technology at the time allowed for continuous presentation of information on the Web (*e.g.*, animation), it did not allow automated presentation of Web page content and it did not allow automated presentation without the cost of reprogramming site content or installing development tools." (*Id*. at ¶14).

18.     The dominant solution for dynamic, and/or animated, presentation on the web during the late 1990's to early 2000's was Flash animation (and its predecessors). The rise of Flash began circa 1995 with the acquisition of FutureSplash by Macromedia, which renamed it to Macromedia Flash. Flash provided a rich, interactive experience that was new to the web and significantly improved on the user experience that was available using static HTML. In order for web users to gain the benefits of Flash, they needed to obtain and install a Flash plugin to view Flash content on their computers. Moreover, Flash content was not inherently modular. Updating or modifying a portion of a Flash experience required recompiling the whole experience, even for small changes.

19.     As a result of its dynamic capabilities, Flash eventually became synonymous with cutting-edge web design, becoming a fundamental tool in the toolbox for web designers. Use of Flash grew rapidly during 2000 to about 2010. By 2010, approximately 30% of web sites were using Flash. Further, Flash dominated the client-side market, with the Flash player residing on about 95% of internet-connected desktop computers in 2010.

20.    Around 2010, as more robust web technologies such as HTML5, CSS3, and JavaScript began to replicate much of the Flash functionality without requiring a plugin, the popularity of Flash began to decline.  By 2015, all major web browsers supported these newer standard technologies that were more robust than Flash, which ran natively in the browser and were both more secure and efficient than Flash.  Use of Flash on web sites had dropped to approximately 15%.  Web browsers gradually announced timelines to drop Flash support, with Adobe retiring Flash in 2020.  HTML5 and JavaScript displaced Flash on the desktop because they enabled flexible, modular systems that matched how the technological solutions for the web evolved.  These solutions also did not suffer from the perpetual security problems afflicting Flash.

21.    As a result of Mr. Quimby's background, interest, experience, and knowledge, he was uniquely positioned to provide a technological solution to the problem of web usability that overcame the limitations of both Web 1.0 and Flash.  Specifically, Mr. Quimby was focused on providing a technological solution that would enable developers to create web slide show presentations of information in organized sequences without the cost and complexity of reprogramming site content.  His solution also enabled web users to view presentations created by web developers or create their own presentations of web content without installing development tools on their computers.

22.    After the collapse of Flash, as infringing uses of the claimed inventions skyrocketed beginning around 2015, the market recognized and realized the enormous benefit of the claimed inventions, which remain an industry standard to this day. The inventions claimed in the patents-in-suit have come to be referred to as carousel ads, which means ads that automatically rotate through a series of web pages. After nearly a decade of use, publishers and analysts have found that the infringing carousel ads can drive up to ten times higher click-through rates as compared

to static ads, which are favored by 90% of users over static ads. It has further been determined that infringing carousel ads may generate leads at a cost-per-conversion of 30 to 50% lower than other ad formats and at a 20-30% lower cost per click than single-image link ads.

### The Invention in the '629 Patent and its Inventive Concepts and Advantages

23.     When Mr. Quimby conceived his inventions, the World Wide Web was adapted to flexibly serve individual web pages, but it was not adapted to serve sequences of web content. (Ex. 2 at ¶12).  The specification of the '629 Patent notes the need for his inventions, in part, as follows:

> [T]here is a need for a web site access system that enables web site owners and developers to provide an automated presentation of desired web page sequences without the costs of reprogramming site content or installing development tools, and that enables web site users to adjust those presentations to their preferences and/or enact their own presentation of web sites of interest, such as through the use of search engine results.

 (Ex. 1 at col. 7:60-67).  Mr. Quimby's inventions addressed this problem and need, by enabling developers to create web slide show presentations of information in organized sequences without the cost of reprogramming site content and enabling web users to view presentations created by web developers or create their own presentations of web content without installing development tools. (Ex. 2 at ¶11).

24.     In conceiving and reducing his inventions to practice, Mr. Quimby overcame technological problems necessarily rooted in computer technology with the ability to use server-side technology, without installing client-side technology, to create a slide show presentation on the World Wide Web.  (*See id.*).  For example, although the World Wide Web, in its preexisting client-server architecture, was adapted to flexibly serve individual Web pages, it was not adapted to serve sequences of web content.  (*Id.* at ¶12).  Likewise, the problems he addressed were not overcome by implementing existing methods of a slide show, photo slide show, or computer slide

show presentation on the web or by conventionally selecting various information sources to display. (*Id*.).  Mr. Quimby authored a feature article in the July 2003 edition of XML Journal (Vol. 4 Issue 7) describing the emerging landscape of the Internet that required a solution like the invention claimed in the '629 patent.  (Ex. 2 at ¶19; Ex. 2-1).

25.    Mr. Quimby's invention improved existing web technology by helping retain web users' attention and creating a flexible and seamless user experience over client-server architecture.  (*See id*. at ¶15).  The '629 Patent notes the improvement in Web user and visitor experience as follows:

> [I]t can be seen that besides guiding visitors more quickly to relevant content, the present invention virtually eliminates the attention that visitors normally invest in pointing, clicking, and scrolling through web pages. As such, visitor satisfaction and productivity is increased, i.e., visitors to a web site stay longer, absorb more information, and return more quickly. The model of a passive site and active visitor clicking through pages is replaced by the adaptive presentation model of active site and active visitor. In this active site/active visitor model the site owner or developer can offer a range of tours through a site wherein each tour is adapted to the interests of a wide range of target audiences. Meanwhile, the visitor can have single-click control for pausing at any page to delve more deeply into available content and can also control the pace of presentation as well as select another presentation. Instead of actively pursuing random paths through web sites one click at a time, visitors now have a choice. They can relax and enjoy one or many pre-established presentations—all with the option of stopping and/or diverting anytime they encounter interesting content.

(Ex. 1 at col. 13:30-50).

26.    Mr. Quimby's invention provided a solution that included web-development flexibility and seamless user experience over client-server architecture. (*See* Ex. 2 at ¶15).  He conceived a system and method that used components, such as a composer and a performer operating on a host server, to gather URLs and create a presentation of web content without needing to reprogram the web site or install development or presentation programs, thereby conceiving a system and method that addressed the problems rooted in the existing approach to continuous delivery of web content. (*Id*.).   His invention embraced at least three inventive

concepts at a high level: (1) providing a customizable web site access system that superseded the hierarchical nature of web architecture enabling web sites to customize the user experience and present relevant content at a modular level without requiring users to scroll and click through layers of web pages, producing a technological paradigm shift in web design; (2) providing an adaptive experience that can be determined essentially at runtime and therefore can consider for example, desired user and web site attributes in substantially real time; (3) using a client-server architecture to provide the customizable web presentation without reprogramming the web site or installing development tools on the user's computer.

27.    The three inventive concepts are found in the claims of the '629 patent.  (*Id*. at ¶17). For example in claim 11 of the '629 Patent, providing a customizable web site access system is implemented in the combined limitations "establishing a list of URLs in said composer by one of a plurality of list establishment methodologies," "determining a display sequence of said list of URLs in said composer," and "automatically locally displaying the created presentation presented by said performer in a slide show format according to said list and said display sequence, wherein each of said plurality of URLs comprises a slide within said created presentation." (*Id.*).  Also in claim 11, providing an adaptive experience that can be determined essentially at run time is implemented in the limitation "establishing a list of URLs in said composer by one of a plurality of list establishment methodologies the plurality of list establishment methodologies comprising manual entry via a user interface portion of the composer and automatic entry by a query-based system." (*Id.*).  Also in claim 11, using client-server architecture to provide the customizable presentation, without needing to install development tools on the user's computer is implemented in the limitations "remotely invoking a composer operating on a host server," limitations discussing the operation of the composer that is operating on the host server (*e.g.*, "creating a

presentation in said composer, wherein said step of creating comprises the steps of: establishing a list of URLs in said composer"; "determining a display sequence of said list of URLs in said composer"; "determining a duration of display for said list of URLs in said composer"), and the limitation "remotely invoking a performer operating on said host server to present said created presentation." (*Id.* at ¶¶15-18).

28.     The composer in the claim operates in an unconventional location, namely on the host server.  The composer further operates differently than individual prior art websites that had fixed links that a user had to click on to navigate through the website.

29.     The performer in the claim operates in an unconventional location, namely on the host server.  The performer further operates differently than prior art websites because it is remotely invoked to automatically locally display the created presentation on a user's computer absent human intervention.  "[R]emotely invoking a performer operating on said host server to present said created presentation; and automatically locally displaying the created presentation in a slide show format . . . and wherein each slide is automatically displayed to a user, absent human intervention. . ." enables web users to view presentations without installing development tools.

30.     The application resulting in the '629 Patent was filed with a "compact disc containing codes and information describing a preferred embodiment of the present invention." (Ex. 1 at 1:18-20).  The submitted code informs a person of skill in the art how to make and use the invention, including how the composer and performer operate and are programmed.

31.     The '629 Patent analogizes the way the inventive and novel claimed composer and performer operate to the known computer concepts of the bookmark feature (for the composer) and the slide show feature of presentation software (for the performer).  (Ex. 1 at 8:67-9:2). The claimed invention does not use either of those then-known features.  For example, claim 11 recites

"establishing a list of URLs in said composer by one of a plurality of list establishment methodologies the plurality of list establishment methodologies comprising manual entry via a user interface portion of the composer and automatic entry by a query-based system." (*Id.* at 14:49-54). Neither of the claimed methods for establishing a list of URLs includes using the bookmark function, but instead recites manually entering the list or using a query-based system for automatic entry. Similarly, as explained herein, the known slideshow presentation software, *e.g.*, Flash animation - did not allow for "automatic local display" "wherein each slide is automatically displayed to a user, absent human intervention." Instead of providing a modular web experience (an automated sequence of modular web objects), Flash provided a monolithic streaming experience (analogous to movie and video formats). Accordingly, the claimed invention does not use the prior art bookmark feature or prior art presentation software.

32. Similarly, the '629 Patent analogizes the benefits of the claimed invention as follows: "[t]he user's experience in accessing the World Wide Web becomes analogous to browsing several publications sequentially instead of reading a single publication in its entirety, *i.e.*, accessing a single-source, static-destination web site." (Ex. 1 at 12:16-20). While the analogy involves a human acting in a pre-Internet world, the claimed invention has no pre-Internet comparable that could be performed by a human. A human cannot perform claim 11. For example, by definition a human cannot perform "wherein each slide is automatically displayed to a user, absent human intervention, for the pre-determined display duration as at least a portion of a web page." (*Id.* at 14:62-67).

33. In providing a more seamless way of navigating through the World Wide Web, Mr. Quimby's inventions disclosed in the '629 Patent address a particular challenge to the World Wide Web of retaining website visitors and conveniently and efficiently providing web content

to users.  The invention created a fundamentally different web presentation experience without re-architecting the underlying web technology.  (Ex. 2 at ¶16).

34.    In addition to the problems addressed by Mr. Quimby's invention, Mr. Quimby "encountered several problems in perfecting the invention and reducing it to practice."  (*Id*. at ¶18).  For example, "initial prototypes employed a client-side module that required installation. This approach was not scalable, and [he] eventually solved the problem by replacing the client-side module with a parameter-driven JavaScript component running in the Web browser."  (*Id*.; *see id*. (providing additional problems solved by Mr. Quimby when perfecting and reducing the inventions to practice)).

35.    The commercial embodiment of the invention was endorsed by Dr. Doug Engelbart, a computing pioneer and legendary innovator who invented the computer mouse and the graphical user interface (GUI) in his Augmentation Research Center. (Ex. 2 at ¶¶6, 20; Ex. 2-2).

36.    An exemplary embodiment of the code to implement the invention claimed in the '629 patent was submitted on a compact disc with the application leading to the '629 patent.  A directory print-out of the exemplary embodiment is included in columns 1-7 of the '629 patent.

### IV.  COUNT I
### (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,171,629)

37.    Upon information and belief, Defendant directly infringed claim 11 of the '629 patent in Texas, and elsewhere in the United States, by performing a method for customizing access to a plurality of websites using https://www.fabletics.com/ ("Accused Instrumentality") (*e.g.*, https://www.fabletics.com/).

38.    The accusation of infringement is supported by Exhibits A-F.  Exhibit A provides a screenshot of exemplary HTML elements associated with the web slide show in Google Chrome

DevTools view. Exhibit B provides a screenshot of JPG resources used as slide show images in the web slide show. Exhibit C depicts the slide sequence. Exhibit D provides publicly available code for https://www.fabletics.com/, including HTML element tags and URLs corresponding to the images and other resources of the slide show presentation. Exhibit E is a screen capture from a web browser showing the homepage of https://www.fabletics.com/, along with the web slide show seen in the upper portion. Exhibit F is a screen capture from a smartphone-based Web browser showing the homepage of https://www.fabletics.com/, along with the Web slide show seen in the upper portion.

39.    On information and belief, the Accused Instrumentality performed the step of remotely invoking a composer operating on a host server. For example, a web browser and/or its associated code or functions, or other remote application, were used to remotely invoke a composer of the Accused Instrumentality. Alternatively, the composer invoker included the code or component that detected a web user's entry into the web site https://www.fabletics.com/, and subsequently invoked a composer that accepts the list of URLs of the web slide show presentation. Further, the composer operated on a host server comprised of the web server or network of servers of the Accused Instrumentality. Host-side resources were used each time the composer was used to establish a list of URLs. Publicly available code for the website, https://www.fabletics.com/, shows that the Accused Instrumentality used HTML, JavaScript, and CSS to create and/or present a slide show of images. Google Chrome DevTools identifies the div class="reviews-slider slick-initialized slick-slider" element and the HTML elements that comprise the slide show. (*See* Ex. A and D).

40.    On information and belief, the Accused Instrumentality performed the step of creating a presentation in said composer.  For example, a web-browser and/or its associated code

or functions, or other remote application, were used to remotely invoke a composer of the Accused Instrumentality.  The composer of the Accused Instrumentality included the code, software, features, resources, function(s) and/or any combination thereof responsible for, among other things, establishing the URLs of the web slide show presentation of https://www.fabletics.com/ shown in the exhibits submitted herewith. (*See* Ex. A, C, and D).

41.    On information and belief, the Accused Instrumentality performed the step of establishing a list of URLs in said composer by one of a plurality of list establishment methodologies, including manual entry via a user interface portion of the composer and automatic entry by a query-based system.  On information and belief, the composer was used to establish a list of URLs by (i) manual entry via any number of user interfaces known to Defendant and/or (ii) automatic entry by querying a database, file, or other resource.  These methodologies, either alone or in combination, result in the presence of the plurality of slides and URLs shown in the exhibits submitted herewith.

42.    On information and belief, the Accused Instrumentality performed the step of determining a display sequence of said list of URLs in said composer.  For example, the resulting display sequence can be seen in the source code and slide sequence provided herewith. (*See* Ex. A and C).

43.    On information and belief, the Accused Instrumentality performed the step of determining a duration of display for said list of URLs in said composer.  For example, the composer of the Accused Instrumentality accepted a pre-set display duration for each of the plurality of URLs. Each slide of the web slide show displays on the web browser for a pre-set duration based on a value or variable accepted by the composer. Navigating to the homepage of

https://www.fabletics.com/ confirmed that the slides of the presentation advance from one slide to the next based on a pre-set display duration.

44.     On information and belief, the Accused Instrumentality performed the step of remotely invoking a performer operating on said host server to present said created presentation. On information and belief, the step of remotely invoking the performer occurred any time a web user navigated to https://www.fabletics.com/ thereby invoking performance of the web slide show. For example, a web-browser and/or associated code or functions, or even an embedded hyperlink were used to invoke the performer as a user navigates to https://www.fabletics.com/. To the extent users of the Accused Instrumentality other than Defendant were involved in performing this step, such performance is nevertheless attributable to Defendant, because, among other things, Defendant directed or controlled performance (*e.g.*, conditioned participation in an activity or receipt of a benefit upon performance and establishes the manner or timing of that performance). By way of example, users could not visit and interact with https://www.fabletics.com/ without first invoking the performer. Further, if a https://www.fabletics.com/ user failed to remotely invoke the performer, the user would not benefit from viewing Defendant's featured promotional offerings in the form of an automated web slide show presentation.

45.     On information and belief, the Accused Instrumentality performed the step of automatically locally displaying the created presentation presented by said performer in a slide show format according to said list and said display sequence.  On information and belief, the performer included the code, resources and/or features on the host server that provided for the automated web slide show of the https://www.fabletics.com/ website, including those resources identified in Exhibit A. The performer could be invoked each time a user navigates to the homepage of the https://www.fabletics.com/ website.  To the extent users of the Accused

Instrumentality other than Defendant were involved in performing this step, such performance was nevertheless attributable to Defendant, because, among other things, Defendant directed or controlled performance (*e.g.*, conditioned participation in an activity or receipt of a benefit upon performance and establishes the manner or timing of that performance).  By way of example, users could not visit and interact with https://www.fabletics.com/ without first automatically locally displaying the created presentation. Further, if a https://www.fabletics.com/ user failed to perform this step, the user would not benefit from viewing Defendant's featured promotional offerings in the form of an automated web slide show presentation.

46.    On information and belief, the Accused Instrumentality performed the step of wherein each of said plurality of URLs comprised a slide within said created presentation.  Each of the plurality of URLs comprises a slide within the created presentation. (*See, e.g.*, URLs in Ex. A, D; *also* Ex. C (exemplary slide sequence)).

47.    On information and belief, the Accused Instrumentality performed the step of wherein each slide is automatically displayed to a user, absent human intervention, for the pre-determined display duration as at least a portion of a web page.  Each slide of the presentation of https://www.fabletics.com/ was automatically displayed to a user, absent human intervention, for the pre-set display duration as at least a portion of a web page. Navigating to the homepage of https://www.fabletics.com/ confirmed that (i) the slides of the presentation advance from one slide to the next based on a pre-set display duration; and (ii) the slides comprise at least a portion of the home page of https://www.fabletics.com/.  For example, The "transform: translate3d" variable in Exhibit A progressively rotates through the values between "-390px, 0px, 0px" and "-1560px, 0px, 0px" in increments of -390px for the series of images; each of the images corresponds to the

parameters "data-slick-index='0'" through "data-slick-index='3'" as the pointer "slick-current slick-active" corresponding to the displayed image progressively rotates through the series of images.

48.    Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such Defendant's infringement of the '629 patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

49.    On information and belief, to the extent marking is required, Adaptive Avenue complied with all marking requirements.    (*E.g.*,    http://www.adaptiveavenue.com/; http://www.adaptiveavenue.com/uspatents/).

## V.  COUNT II
## (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,428,707)

50.    Plaintiff incorporates the above paragraphs herein by reference.

51.    On September 23, 2008, United States Patent No. 7,428,707 ("the '707 Patent") was duly and legally issued by the United States Patent and Trademark Office.  The '707 Patent is titled "Customizable Web Site Access System And Method Therefore." A true and correct copy of the '707 Patent is attached hereto as Exhibit 3 and incorporated herein by reference.

52.    Adaptive Avenue is the assignee of all right, title and interest in the '707 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '707 Patent.  Accordingly, Adaptive Avenue possesses the exclusive right and standing to prosecute the present action for infringement of the '707 Patent by Defendant.

53.    The application leading to the '707 patent was filed October 31, 2003, which was a continuation in part of application no. 10/014,929, which issued as the '629 patent.  (Ex. 3 at cover).  The '707 Patent was first assigned to Adaptive Avenue Associates, Inc.  (*Id.*).

54.    The invention in the '707 Patent relates to the manner in which a user and/or developer of the World Wide Web presents and/or accesses a web site; and more specifically, to a system and method to enable multiple types of automated navigation through a plurality of website addresses.  (*Id.* at col. 1:24-28).

55.    The '707 Patent includes the entire specification as the '629 Patent[1] and therefore Adaptive Avenue incorporates the background and discussion of the invention in Paragraphs 13-25.

56.    In many respects, the '707 Patent is concerned with solving the same technological problems with the web as the '629 Patent. Specifically, claim 7 of the '707 Patent relates to the way a user and/or developer of the World Wide Web presents and/or accesses a web site. More specifically, claim 7 of the '707 Patent recites a method to enable multiple types of automated navigation through a plurality of website addresses. Of particular advantage to the invention claimed in the '707 Patent is the unconventional feature for auto-composing a website with automatic extraction of web page details from a desired web page. In the prior art, a slideshow was composed manually and then stored in a file using standard HTML format with a specific name at a specific location. The technological improvement claimed in the '707 Patent includes composing a presentation for a desired web page by creating a list of URLS by auto extracting a plurality of hyperlinks found within the desired web page that provides a plurality of URLs and then

---

[1] The application leading to the '707 Patent was a continuation-in-part of the '629 Patent and included the entire specification of the '629 Patent plus additional information supporting claims in the '707 Patent.

automatically displaying the presentation in order of the plurality of URLs provided by the extracted web page details.

57.    Furthermore, as shown in the prosecution history of the '707 Patent, the patent examiner determined that it was unconventional to automatically compose a slide show through the automatic extraction of web page details.  (Ex. G at 8-9).  The patent examiner determined that in the prior art, the slide show was composed manually and then stored in a file using standard HTML format with a specific name at a specific location.  (*Id.*).  The examiner agreed that the claim was allowable because the prior art did not disclose that the plurality of hyperlinks found within the desired web page that provides a plurality of URLs, a presentation/rendition text file within the desired webpage that provides a plurality of URLs, a meta tag within the desired webpage that provides a plurality of URLs; and a performer wherein said performer displays said web slide show presentation in order of the plurality of URLs provided by the extracted web page details.  (Ex. H at 2).

58.    **Direct Infringement:** Upon information and belief, Defendant directly infringed claim 7 of the '707 patent in Texas, and elsewhere in the United States, by performing a method for auto composing a web site using https://www.fabletics.com/ ("Accused Instrumentality") (*e.g.*, https://www.fabletics.com/).

59.    The accusation of infringement is supported by Exhibits A-F.  Exhibit A provides a screenshot of exemplary HTML elements associated with the web slide show in *Google Chrome DevTools* view. Exhibit B provides a screenshot of JPG resources used as slide show images in the web slide show. Exhibit C depicts the slide sequence. Exhibit D provides publicly available code for https://www.fabletics.com/, including HTML element tags and URLs corresponding to the images and other resources of the slide show presentation. Exhibit E is a screen capture from

a web browser showing the homepage of https://www.fabletics.com/, along with the web slide show seen in the upper portion. Exhibit F is a screen capture from a smartphone-based Web browser showing the homepage of https://www.fabletics.com/, along with the Web slide show seen in the upper portion.

60.     On information and belief, the Accused Instrumentality performed the step of composing a presentation for a desired web page by creating a list of URLs. Dynamic server-side components on Defendant's web servers can be used to display different data, such as different images in the web slide show presentation, depending on variable values given to the page on the web server, before the web page is sent to the web browser to be displayed. The composer of the Accused Instrumentality automatically extracted web page details in order to display the slide show images. The Accused Instrumentality created a presentation from the URLs that were seen in the available source code (*see* Ex. D). Publicly available code for the web site, https://www.fabletics.com/, shows that the Accused Instrumentality used HTML, JavaScript, and CSS to create and/or present a slide show of images. Google Chrome DevTools identifies the div class="reviews-slider slick-initialized slick-slider" element and the HTML elements that comprise the slide show. (*See* Ex. A and D).

61.     On information and belief, the Accused Instrumentality performed the step of composing a presentation for a desired web page by creating a list of URLs, wherein said step of composing comprises (a) automatically extracting a plurality of hyperlinks from the desired web page, wherein the plurality of hyperlinks provides the URLs, (b) automatically extracting a presentation/rendition text file from said desired web page, wherein the text file provides said URLs, or (c) automatically extracting a meta tag from the desired web page, wherein said meta tag provides said URLs.  The desired web page is https://www.fabletics.com/, which included "web

page details" (*e.g.*, the addresses of other web pages that a web user may want to access). The plurality of hyperlinks and corresponding web pages that got automatically extracted and automatically invoked in a user's web browser are the image URLs (*see* Ex. C).

62.    On information and belief, the Accused Instrumentality performed the step of automatically displaying the presentation, wherein the presentation is presented in order of the created list of URLs. The step of automatically displaying the presentation in the Accused Instrumentality included the software components that loaded and advanced the URLs to be displayed. The step of automatically displaying the presentation in the Accused Instrumentality was activated by a web user entering the web site https://www.fabletics.com/. The step of automatically displaying the presentation in the Accused Instrumentality served and presented the web slide show to the web user (*see* Ex. A, B, and C). For example, the "transform: translate3d" variable in Exhibit A progressively rotates through the values between "-390px, 0px, 0px" and "-1560px, 0px, 0px" in increments of -390px for the series of images; each of the images corresponds to the parameters "data-slick-index='0'" through "data-slick-index='3'" as the pointer "slick-current slick-active" corresponding to the displayed image progressively rotates through the series of images

63.    Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such Defendant's infringement of the '707 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

64.    On information and belief, to the extent marking is required, Adaptive Avenue complied with all marking requirements.    (*E.g.*,    http://www.adaptiveavenue.com/; http://www.adaptiveavenue.com/uspatents/).

## VI.  JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a.    Judgment that claim 11 of United States Patent No. 7,171,629 was infringed, either literally and/or under the doctrine of equivalents, by Defendant;

b.    Judgment that claim 7 of United States Patent No. 7,428,707 was infringed, either literally and/or under the doctrine of equivalents, by Defendant;

c.    Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

d.    That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

e.    That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

October 17, 2025

DIRECTION IP LAW

*/s/ Steven G. Kalberg*
David R. Bennett (IL Bar No.: 6244214)
Steven G. Kalberg (Il Bar No.: 6336131)
(*Admitted to the U.S.D.Ct. for the E.D. Texas*)
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com

*Attorney for Plaintiff*
*Adaptive Avenue Associates, Inc.*